Louis SASMOR, Plaintiff, *v.* V. VIVAUDOU, INC., et al., Defendants.

Supreme Court, Trial Term, New York County, March 20, 1951.

*William Walter Frankel, Robert James Frankel* and *Jacob Markowitz* for plaintiff.

*Jack M. Goddard* for defendants.

MATTHEW M. LEVY, J. This action at law was tried before the court without a jury. Formal findings of fact and conclusions of law were waived by stipulation. I shall undertake to state the facts which I deem essential (*Mason* v. *Lory Dress Co.*, 277 App. Div. 660; *Steel Co. of Southern California* v. *Associated Metals & Minerals Corp.*, 277 App. Div. 687).

The plaintiff Louis Sasmor and the defendant V. Vivaudou, Inc. (hereinafter referred to as Vivaudou) entered into a written agreement, under seal, dated January 22, 1947, whereby Vivaudou employed plaintiff as its director and manager of sales at a fixed salary of $12,000 per year plus 5% of Vivaudou's net profits for the year (before provision for Federal income taxes). The length of employment under the contract was fixed as follows: " The term of this agreement and the period of Louis Sasmor's employment hereunder shall be for two years beginning January 1, 1947, and ending December 31, 1948. Unless notice to the contrary is given by either party to the other in writing on or before October 1, 1948, this agreement shall be automatically renewed for a like term from January 1, 1949."

In his complaint the plaintiff alleges that he neither gave nor received written notice of termination on or before October 1, 1948, and that the term of his employment was therefore automatically renewed to December 31, 1950, pursuant to the provisions of the contract. The plaintiff further alleges that on or about February 23, 1949, during the claimed extended term of the written contract of employment he was discharged, and he sues to recover $30,000 in damages because of the alleged breach.

Upon the trial, there was no proof of any profits by Vivaudou, and there was some proof of other employment by plaintiff, reducing the *ad damnum* to $14,000.

Vivaudou is not the only defendant. The plaintiff has also sued Universal Laboratories, Inc. (hereinafter referred to as Universal). The plaintiff's theory in joining Universal as a defendant in the action is that the contract provided that the plaintiff's duties were '' subject to the control and supervision of the principal officers of Universal Laboratories, Inc., and its Board of Directors ''; that Vivaudou is one of several wholly owned subsidiaries of Universal; that the officers and directors of each corporation are the same; that on or about March 6, 1947, Universal's board of directors approved and adopted the agreement; and that Vivaudou is merely a department or instrumentality of Universal, its parent company; and that therefore Universal is responsible at law for the contract made by Vivaudou.

On the first phase of the case, the defendants deny that the plaintiff was not given due written notice of termination. Accordingly, one of the basic factual issues in this case is whether written notice of the refusal of the employer to renew the contract was given plaintiff on or before October 1, 1948.

The defendants assert that on September 29, 1948, a letter was mailed by them to the plaintiff at his usual residence, advising him that his employment would be terminated at the end of the year. Under normal mailing processes, he should have received the letter on or before October 1, 1948. The plaintiff denies that he received it. The defendants produced what purported to be a carbon copy of it, which copy the plaintiff claims is spurious.

The plaintiff argues that notice is '' given '' when it is '' received '', not when it is '' mailed '', and that, since the contract requires that notice be '' given by either party to the other in writing on or before October 1, 1948,'' proof of *mailing* on September 29, 1948, is insufficient, in the face of his denial of receipt.

There is no doubt, as argued by the plaintiff, that, in negotiations pending the making of a contract, the offeror may dictate the way in which an acceptance must be transmitted, and whether it must in fact be received, before there is a binding agreement (1 Williston on Contracts, § 88). Nor is there any question, as urged by the defendant, that where there is no such condition, the mailing of the offeree's acceptance in response

to a mailed offer is decisive of the point at which the contract is entered into (*Shubert Theat. Co.* v. *Rath,* 271 F. 827, 834).

I do not consider either line of cases helpful. In the situation at bar, the issue is not the *making* of the contract but rather its *meaning* after it has already been made. A contract, once entered into, may provide that notices therein specified are effective if mailed, or that they must be received and not merely sent (*Vassar* v. *Camp,* 11 N. Y. 441). While there is no clear specific provision in that regard spelled out in the present contract, I am inclined to construe the requirement of " given " to mean " delivered " (*Peabody* v. *Satterlee,* 166 N. Y. 174). The defendant has cited no authorities in point to support a contrary view.

Section 160 of the Negotiable Instruments Law provides that notice of dishonor must be " given " an indorser, lest he be discharged, and the defendant relies upon a court decision that the mailing of such notice is sufficient, although it never reaches the indorser (*Bank of United States* v. *Lunenfeld,* 165 Misc. 654). Aside from the possible difference in meaning between the statutory and contractual use of the word, I conceive that, perhaps, the necessities of business in relation to the utilization of commercial paper have influenced the law merchant. Nor do the facts in this case justify the defendant's construction. In the case at bar, the contract was not entered into by use of the mails (*McCurdy Co.* v. *Wegner,* 129 Misc. 230). Nor were there several thousand persons to whom notices were required to be sent (*Kantrowitz* v. *Dairymen's League Co-op. Assn.,* 272 App. Div. 470).

Construing, as I do, this contract in plaintiff's favor, I require receipt of the notice of nonrenewal, not merely the mailing of it. But the plaintiff is in error in contending that his denial of receipt disposes of the issue (*McCoy* v. *Mayor,* 46 Hun 268). It still remains a question of fact on all the evidence. The facts clearly demonstrate that the plaintiff did receive the notice in question on or before its due date. And in so holding, I do not rely alone upon the well-recognized presumption, arising from mailing, that the notice reached its destination (*News Syndicate Co.* v. *Gatti Paper Stock Corp.,* 256 N. Y. 211; cf. *Trusts & Guar. Co.* v. *Barnhardt,* 270 N. Y. 350).

During the course of the trial, considerable testimony was offered on the issues as to whether the defendants mailed the notice and whether the plaintiff received it. It will be easier to unfold the story and thus to understand the contentions of

the parties if we consider now the evidence adduced on behalf of the defendants, both in direct and in cross-examination. This I do without purporting to narrate all of the evidentiary facts which have persuaded me to find, as I do, that such notice was duly given, and that the plaintiff's continued employment beyond December 31, 1948, was not on the basis of a renewal of the written contract for the specific term therein specified, but rather on a monthly arrangement in order to aid in the disposition of the merchandise and to facilitate the liquidation of Vivaudou's depreciating business.

Universal is a corporation having about $1,800,000 in total assets. It is listed on the New York Stock Exchange. Morris H. Gotthilf, the chairman of its board of directors, owns a substantial, although not a majority, portion of its outstanding stock. Vivaudou is one of Universal's corporate subsidiaries.

On a number of occasions before September, 1948, Morris Gotthilf conferred with the plaintiff, as Vivaudou's director and manager of sales, on the need for liquidating Vivaudou because of its very bad financial showing. Plaintiff was made completely aware of Vivaudou's precarious position. At a meeting in September, 1948, immediately following a conference called for the purpose of boosting Christmas sales of Vivaudou products, and thereby reducing a large inventory, Morris Gotthilf advised the plaintiff that because of substantial losses incurred by Vivaudou, this company would have to be liquidated and that plaintiff should seek other employment.

Minutes of a meeting of the executive committee of the corporation held on September 29, 1948, substantiate the defendants' oral testimony that Vivaudou had under consideration the necessity of liquidating its business and terminating such of its contracts as expired beyond December 31, 1948. Minutes of a meeting of the corporation's board of directors held on September 30, 1948, state that the minutes of the meeting of the executive committee, held on the day before, were read and approved, and also disclose the intention of Vivaudou to liquidate its business. The minutes of the executive committee and of the board of directors were prepared by the defendants' attorney, an officer of the corporations, who testified before me as to their genuineness and chronological authenticity.

On September 29, 1948, Morris Gotthilf dictated a letter to his secretary, addressed to the plaintiff, advising him that his employment would be terminated at the end of the year. On the same day, Gotthilf told his secretary to have the controller

of the corporations issue a check to plaintiff covering his salary to date, and to have the letter and check mailed together that very day. Morris Gotthilf's secretary, Edith Keims, testified that she typed the letter dictated by Gotthilf, that he signed it, and that upon being called, the controller came into Gotthilf's office.

Ernst Hoefer, the controller and head bookkeeper, testified that he went into Gotthilf's office and was given the letter, which already had been signed by Gotthilf, for the purpose of attaching the plaintiff's pay check to the letter. Hoefer recognized that the notice was necessary to effectuate a nonrenewal of the plaintiff's employment contract. Hoefer further testified that the check had been prepared a day or two before, in accordance with the practice adopted by the company, and that he took the check, signed it and handed it, together with the letter, to Arnold M. Gotthilf, the treasurer of the company, for counter-signature; that the treasurer read the letter, countersigned the check and returned both documents to him; that he enclosed the letter and the check in an envelope, properly addressed to the plaintiff at his correct address, affixed the necessary stamps, and personally deposited it that day in a post-office mail chute located in the outer office of the premises of the company.

Arnold Gotthilf, the treasurer, testified that Hoefer gave him the check, which he countersigned, and also that he read the letter addressed to the plaintiff. He further stated, in corroboration of Hoefer's testimony, that he returned the check and the letter to Hoefer for mailing.

In addition to the foregoing evidence, the defendants offered the testimony of two reputable experts whose opinion it was that the carbon copy of the letter of September 29, 1948, addressed to the plaintiff, which they had separately examined, and which was taken from the company files, was typed on the typewriter in the defendants' offices at a period of time close to the date of that letter. One of these witnesses also is a paper expert and he testified that the carbon copy of the letter was typed on the same kind of paper as was used by the secretary to the chairman of the board of directors in typing other letters about the time this disputed letter was prepared. These opinions were based upon comparisons with genuine documents prepared in defendants' offices during a period of time appropriate to and consistent with the time element involved in the issue now being considered.

After carefully considering all the evidence presented at the trial, I am fully convinced that the proof is overwhelming and the conclusion is inescapable that notice in writing was given by the defendants to the plaintiff on or before October 1, 1948, that the employment of the plaintiff would be terminated as of December 31, 1948. The plaintiff admitted that he did receive, by October 1, 1948, the check which the defendants' witnesses testified was enclosed in the same envelope with the letter — though the plaintiff was unable to state whether he received the check in person or by mail. The plaintiff's denial that he was aware of Vivaudou's serious financial straits is at best questionable in view of the fact that he was the sales manager of the company. It is also logical to believe that Morris Gotthilf, as the head of the company, would confer with the sales manager as to business problems. It is equally reasonable to infer that, as the financial problems of Vivaudou were critical, a very serious effort would be made to cut down expenses, and that plaintiff's contract with Vivaudou would be terminated as early as possible, if Vivaudou would not be liquidated altogether.

I believe it to be the fact that before the action taken at the meetings of the executive committee on September 29, 1948, and the board of directors on September 30, 1948, the plaintiff was orally informed that his employment would soon come to an end, and that this was carried out by sending him the written notice required under his employment contract.

Some time before the trial the plaintiff retained an expert on questioned documents who, pursuant to court order, and in the presence of plaintiff's counsel, examined the defendants' typewriter and the carbon copy of the the September 29, 1948, letter, and other material for purposes of comparison, in order to arrive at an opinion as to the genuineness of the disputed document. This expert was present in court during the trial. Nevertheless, plaintiff never called upon him to testify. The law is clear that the trier of the facts, under such circumstances, may consider the testimony of the defendants' witnesses as to the authenticity of the carbon copy most strongly against the plaintiff (*Milio* v. *Railway Motor Trucking Co.,* 257 App. Div. 640; *Perlman* v. *Shanck,* 192 App. Div. 179).

I have come to my conclusion, as above stated, on the assumption that the burden of proof on this issue was upon the defendants. I am convinced, as the trier of the facts, that the defendants have sustained this burden by a fair preponderance of the credible evidence. I must state, however, that it is my view that the burden of persuasion on this issue — as dis-

tinguished from the burden of going forward with some evidence — is upon the plaintiff. I am of the opinion that, in line with the allegations of his complaint, the burden was upon the plaintiff to prove the continued existence of the contract at the time of the discharge.

In this case, the language of the agreement is not susceptible of the judicial interpretation that the contracting party was given the right of defeasance of a contract in force — this was not a one-sentence four-year agreement, with the right given the moving party to exercise an option to diminish the specified term by notice. Were such the circumstances, it might, with some merit, be argued that the defendant has the burden of proving that he has exercised the option to cancel the contract. Here, we are dealing with a two-year agreement, provided for in one sentence; and in another sentence of the contract clause, a provision is made to extend the term for a further two-year period, unless either party gives notice of nonrenewal. Under the precise and peculiar language here employed, the absence of such notice is, in my view, a condition precedent to the continued existence of the contract. Unless there was a contract in force in 1949, the plaintiff's discharge was not a breach. Thus, the plaintiff must prove there was an existing agreement on February 23, 1949, running to December 31, 1950. In other words, the plaintiff must prove that there was no notice of nonrenewal.

I have held, in accord with the plaintiff's contention, that the proper construction of this agreement requires that the critical notice of nonrenewal be not merely sent to, but that it must be received by, the plaintiff. Upon whom, then, should be placed the burden of proving nonreceipt by the plaintiff? It seems to me that that burden must be upon the only party who can have actual knowledge of receipt or nonreceipt — that is, the plaintiff.

The fact that, under my ruling, the plaintiff is expected to prove a negative — that he was *not* given the notice specified in the contract — does not relieve him of the burden he bears of convincing the trier of the facts, nor does it cast the burden of proof upon his adversary. It is not at all unusual that the burden is imposed by law upon a protagonist of persuading the judicial tribunal that a certain thing did *not* occur or that a certain condition did *not* exist (*Stokes* v. *Stokes*, 155 N. Y. 581; *Farmers' Loan & Trust Co.* v. *Siefke*, 144 N. Y. 354; *Schlesinger* v. *Hexter*, 2 Jones & Sp. 499; *Atlantic Trust Co.* v. *Crystal Water Co.*, 72 App. Div. 539; *People ex rel. Smith* v. *Pease*, 27 N. Y. 45).

With respect to the second branch of the case, and assuming that no notice was given to the plaintiff, and that therefore the employment contract was breached, the question arises as to whether the defendant Universal can be held liable for the contract which concededly was entered into between the plaintiff and the defendant Vivaudou. First, let me dispose of some preliminary matters of pleading.

In paragraph 10 of the complaint, it is alleged that "on or about the 6th day of March 1947, the Board of Directors of defendant, Universal Laboratories, Inc., duly approved and adopted said agreement between Plaintiff and Defendant, V. Vivaudou, Inc." This was admitted by failure to deny in the answer. At the trial, the defendants moved to amend the answer by interposing a denial. Decision was reserved. The proof is indisputable that Universal's board of directors, at its meeting on March 6, 1947, did not adopt the agreement. I am convinced that the failure to deny in the answer was inadvertent. The trial proceeded as if there had been a denial. I therefore grant the motion, with exception to the plaintiff.

The plaintiff moved at the trial to amend the complaint with respect to paragraph 10, by alleging that "after the contract with V. Vivaudou and the plaintiff was signed and executed, that defendant Universal Laboratories duly approved said agreement between the plaintiff and the defendant V. Vivaudou, and exercised such dominion and control over the defendant V. Vivaudou, Inc., and plaintiff's performance under the contract as to constitute a complete adoption of that contract." I reserved decision on the plaintiff's motion in that regard. I now grant the motion, with exception to the defendants, so as to give the plaintiff full opportunity to reap the benefit of all supporting evidence adduced at the trial.

Now, as to the facts: Undoubtedly, Universal, through the identity of officers and directors, controlled Vivaudou. Universal owned all of the capital stock of Vivaudou. Consolidated tax returns were filed. Consolidated financial statements were sent to stockholders of Universal, and they did not reflect any breakdown with respect to Vivaudou. Advertising and information bulletins bore the legend "V. Vivaudou, Inc., division of Universal Laboratories, Inc." Universal extended credit to Vivaudou. Certain contracts (not all) were made by Universal as principal on behalf of Vivaudou, because of Vivaudou's questionable financial status. There was some commingling of funds, but with separate accounting protective procedures.

That is not enough upon which to ignore the corporate status of Vivaudou in this action at law. The evidence disclosed that Vivaudou was not set up as a dummy of Universal. In fact it was incorporated long before Universal and was known in the trade for its particular brands of cosmetic products, merchandise quite different from that handled by Universal's other subsidiaries. Vivaudou maintained a separate set of books of account; had its own employees; had its own bank accounts; executed its own checks; made its own purchases; did its own billings on its own statements; collected its accounts receivable; generally made its contracts in its own name; paid its own liabilities; and had its own plant in New Jersey. The plaintiff was an employee of Vivaudou long before Universal became its sole stockholder; and the contract sued upon here was knowingly made with Vivaudou alone by the plaintiff, who at the time of its execution was a stockholder of Universal.

The evidence is clear that Vivaudou was a separate and distinct entity, was treated as such, and was not used as a decoy or fraudulent front for the benefit of Universal. I am persuaded that Universal cannot be held liable for the contract between Vivaudou and the plaintiff (see *Jenkins* v. *Moyse*, 254 N. Y. 319; *Pagel, Horton & Co.* v. *Harmon Paper Co.*, 236 App. Div. 47, and *Berkey* v. *Third Ave. Ry. Co.*, 244 N. Y. 84.).

In the case of *Lowendahl* v. *Baltimore & Ohio R. R. Co.* (247 App. Div. 144, affd. 272 N. Y. 360), the court set forth three elements which must be proved before it will disregard the separate corporate entity of the subsidiary and hold the parent liable. These elements were stated as follows (pp. 157–158):

" (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had *at the time* no separate mind, will or existence of its own; and

" (2) Such control must have been used by the defendants to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

" (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of."

None of these requirements, it seems to me, has been proved to exist in the present case; and certainly all have not been.

It might be noted here that in the *Lowendahl* case (*supra*) the court had before it an action in equity, while in the case

before me the action is at law. And, as stated in Morawetz, in his work on Private Corporations (2d ed., Vol. 1, § 227), the corporate entity is dogmatically observed on the law side when it would not be in equity. On the other hand, I. Maurice Worm-ser, in his book entitled '' Disregard of the Corporate Fiction and Allied Corporation Problems '', discussing the question of when it is proper for a court to disregard the corporate entity, says at page 44: '' It has been oftentimes stated that courts of law invariably adhere to the entity theory even though gross miscarriages of justice result. It is quite true that equity, less abashed by forms or fictions than a court of law, is more willing to draw aside the veil and look at the real parties in interest. However, courts of law have, again and again, refused to be trammeled by scholastic logic and mediæval corporate ideas, which frequently serve only to distort or hide the truth.''

While there has been much theoretical discussion, there has not as yet been enough judicial determination to warrant a heedless acceptance of the thesis that the corporate entity should be disregarded, even in actions *ex contractu,* by ignoring simul-taneously the distinctions between law and equity. But the modern, and I think the correct, tendency is to resolve judicial problems in accord with the substance of the issue, rather than the mechanics of the judicial process. If it were necessary so to conclude, I do not doubt that, certainly when sitting without a jury, I would not tolerate, even in a law action, any attempt of a completely dominating parent corporation, by resorting to the utilization of a dummy corporate subsidiary, to commit a grievous wrong or to do a dishonest and unjust act in contra-vention of a plaintiff's legal rights. I should not, in such case, in order to achieve justice, hesitate to pierce the corporate veil, and to cast aside the subsidiary's allegedly separate entity. I do not conceive the legal necessity, nor the advantage in judicial administration, of compelling the dismissal of the law action, or even of its transfer to the equity side of the court. Quite obvious, on the other hand, are the expense and delays incidental to and concomitant with such practice. However, the facts in this case do not require the determination of such issue of judicial procedure now.

Upon all of the evidence, I grant judgment on the merits in favor of the defendants, with exception to plaintiff. In view of this conclusion it is not necessary now to pass upon the motions of the defendant Universal to dismiss the complaint as to it, made at the close of the plaintiff's case and at the close of the

entire case, decisions on which were reserved on the trial. The plaintiff's motion for judgment in his favor is denied, with appropriate exception to him.

Findings of fact and conclusions of law having been waived, the above constitutes the decision of the court. Settle judgment on notice. The exhibits, which are with the clerk of the court, may be delivered to respective counsel.