Michael Catalano, J.
Plaintiff, Fifty States Management Corp. (Fifty) commenced four actions against defendants, Public Service Mutual Insurance Company (Public), National *779 Life Insurance Company (National) and Benderson Development Co., Inc. (Benderson), that were tried together before a jury and were briefly described as Action No. 1 (Dec. 4, 1969 fire), Action No. 2 (Feb. 3, 1970 fire), Action No. 3 (March 4, 1970 fire) and Action No. 4 (March 18, 1970 fire and explosion).
In the four actions, Public alleged affirmative defenses against Fifty, charging increased hazard, concealment and fraud; National and Benderson cross-claimed against Public; Public answered National’s cross claim affirmatively, alleging cancellation of the insurance policy as of March 1, 1970 before the last two losses occurred.
In a motion by National, a summary judgment was granted March 22, 1971, in Actions No. 1 and No. 2, by Hon. Gilbert H. King, a Justice of the Supreme Court, upon its cross claim against Public, directing that the damages be determined before a jury, to be binding on all parties herein, and payable to National. Instead of going to trial, the parties stipulated that the damages incurred in fires on December 4, 1969 and February 3, 1970 amounting to $53,750 be paid to National, and they were so paid.
July 8, 1966, Benderson, by corporate warranty deed, conveyed to Fifty certain real property improved with a large theatre and a 10-story office building (Lafayette Building), subject to a mortgage held by National having a principal balance due of $4,844,585.22, of which $619,600.32 was applicable to said premises. At the same time a joint bond and second mortgage (one instrument) was executed by Fifty to Bender-son in the amount of $50,000, together with a mortgage note in the same amount, as well as an assignment of rents to Benderson which was to pay the first mortgage principal and interest, tax and insurance escrow payments, and then pay the excess income to Fifty.
Since June 4, 1962, Public and Aaron S. Freedman Agency, Inc. (Freedman) were parties to an agency agreement, granting Freedman full underwriting authority to receive and accept contracts of insurance in behalf of Public, including the duty and authority to “refund ratably to the Company, on business heretofore or hereafter written, commissions on cancelled liability and on reductions in premiums at the same rate on which such commissions were originally retained.”
A multi-peril policy was issued for Public and signed by Freedman, stating the insured’s name and mailing address as ‘1 Fifty States Management Corp. and/or Benderson Development Co., Inc., a/i/m/a (as interest may appear), 14 Lafayette *780 Square, Buffalo, New York 14203,” for three years, July 15, 1966 to July 15, 1969, covering the building for $800,000 and loss of rents up to $120,000, and naming National as first mortgagee. A renewal policy was issued for Public by Freedman, attached to which was a notice from Freedman stating that it concerned “Fifty States Management Corp. and/or Benderson Devel. Co., Inc. 2-16 Broadway (Lafayette Bldg.)”. This renewal policy changed the insured’s mailing address through a clerical error as follows: “Insured’s Name and Mailing Address Fifty States Management Corp. and/or Benderson Development Company Inc., a/i/m/a 570 Delaware Ave., Buffalo, N. Y. 14202 ” increasing the coverage on buildings to $1,400,000 and continuing loss of rents at $120,000. The cancellation clause (as corrected by stipulation in open court) provided: ‘1 This policy may be cancelled at any time by this Company by giving to the insured a 20 days’ written notice of cancellation with or without tender of the excess of paid premium above the pro rata premium for the expired time, which excess, if not tendered, shall be refunded on demand. Notice of cancellation shall state that said excess premium (if not tendered) will be refunded on demand.” “ Definitions-section 11 ” of this policy provided: 1 ‘ When used in the provisions applicable to Section 11 of this policy (including endorsements forming a part hereof); * * # ‘ insured ’ means any person or organization qualifying as an insured in the ‘ Persons Insured ’ provision of the applicable insurance coverage. The insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the Company liability”. The policy of insurance in effect at the time of the four losses had a golden sticker affixed to the top stating, in part: 1 ‘ Aaron S. Freedman Agency, Inc. represented by Morris Himmel ’ ’. Said Himmel had persuaded Fifty to increase the renewal policy to $1,400,000.
A notice of cancellation of the fire insurance policy, date of mailing February 11, 1970, property covered 2-16 Broadway including 437-439 Washington St., Buffalo, N. Y., stated: ‘ ‘ Take notice that the above policy in its entirety, including any mortgagee or loss payable clause, is hereby cancelled as to all interests insured. You will, therefore, please take notice that at the expiration of 20 days from the receipt of this notice, unless surrender thereof to us be sooner made, the said policy will terminate and cease to be in force.” This notice also stated: “Insured — Fifty States Management Corp. and/or Benderson Development Co., Inc., a/i/m/a 570 Delaware Ave. *781 Buffalo, N. Y. 14202; ” “ Mortgagee — National Life Insurance Co. National Life Drive, Montpelier, Vermont 05602; ” ‘1 Producer— Aaron S. Freedman Agcy. Inc. 1500 Hertel Ave. Buffalo, N. Y. 14216; ” and it was subscribed: ‘‘ Public Service Mutual Insurance Company by (signed) Caroll Colway, Aaron S. Freedman Agcy. Inc., Authorized Representative.”
On February 11, 1970, Public mailed one copy of this notice to 570 Delaware Ave., Buffalo, N. Y. 14202, Benderson’s address, but it failed to send one to Fifty at its address in the Lafayette Building, 2-16 Broadway, Buffalo, N. Y. 14203, or to Fifty at its alternate address 14 Lafayette Square, Buffalo, New York 14203. (Notice the different zip code numbers.)
February 19, 1970, Fifty by Frank J. Bona, as President, wrote Freedman a letter stating that a “Mr. Benderson ” notified him of the cancellation, ‘ ‘ Accordingly, would you make arrangements to extend time to us. Perhaps your office can be of assistance to us in this matter for other insurance.”
February 23, 1970, Freedman, by Morris Hi mm el, C. P. C. V., Vice President, answered Fifty, inviting Bona to come into the office and apply for new insurance; on the yellow, carbon copy of this letter is written: “2/25/70 Spoke to Dorothy Silver. She is mailing new notice tomorrow to 50 States not at this office giving them 20 days. M. H.” Dorothy Silver was assistant underwriter for Public at its office in Rochester, New York.
A second notice of cancellation, date of mailing February 26, 1970 was mailed from Rochester, New York, similar to the first notice, except that it changed the insured to: “50 States Management Corp. 703 Lafayette Bldg. Buffalo, N. Y. 14203.” One copy thereof was mailed to Fifty but none to Benderson.
March 4, 1970, National mailed a letter, received March 6, 1970 by Freedman, stating that National received a notice of cancellation as of March 1, 1970 and that National demanded the “ return premium check.”
May 12, 1970, Public sent an unearned premium bill to Freedman which, through Morris Himmel, canceled the insurance policy effective March 3, 1970 and directed the payment of return premium of $636.
May 26, 1970, Freedman sent its check for $636 to National, which cashed it.
June 17,1970, Public sent its check for $636 to National which retained it as evidence, but did not cash it.
December 29, 1970, National mailed a letter to Freedman stating: “A review of our file has brought to our attention *782 that the request and acceptance of a refund on the above Public Service policy was made through clerical error. Therefore, we are returning to you the refund in the amount of $636.00.” This check dated the same date was received by Freedman, which cashed it.
It was stipulated in open court that National’s acceptance of unearned premium was not binding on Benderson or Fifty; that National, Fifty, and Benderson were entitled to 20 days’ notice of cancellation, starting to run from the receipt thereof; that Benderson was not bound by any alleged acts of increased hazard, concealment or fraud which apply solely to Fifty.
“ The time of the fire and of the loss established the rights of the parties, and in the absence of an election by the company to repair, the amount of the loss payable to the mortgagee became fixed as of that time.” (Savarese v. Ohio Farmers Ins. Co., 260 N. Y. 45, 54.)
Here, Public did not elect to repair, so that the four losses became fixed at each date thereof, to wit: December 4, 1969, February 3, 1970, March 4, 1970 and March 18, 1970.
Cancellation notices must be mailed strictly in accordance with applicable statutes, allowing a set time before date of cancellation and containing all information required by statute; any ambiguity is strictly construed against the insurer. (Government Employees Ins. Co. v. Mizell, 36 A D 2d 452, 453-454.) Insurer’s failure to comply strictly and literally with the policy renders an attempted cancellation nugatory. (Ibid., p. 454.)
1 ‘ A policy of insurance may be canceled at any time before loss, by agreement between the parties, and there may be cancelation by consent of the parties, express or implied from the circumstances, independently of the terms of the policy.” (Ann. 152 A. L. R. 95, 97. Jackson v. Fire Assn. of Philadelphia, 13 N. Y. St. Rep. 257, affd. 122 N. Y. 665.)
Here, no cancellation was agreed upon between the parties before any loss. The unilateral attempts to cancel were never properly completed.
In an Illinois case 1‘ Defendant resorted to a subterfuge in an attempt to escape liability for the- loss under the policy by sending to plaintiff a check for $21.25, purporting to be returned premiums supposed to cover the loss in question. This check was returned by plaintiff to defendant. After the loss occurred it was too late to return premiums paid to cover such a loss. The attempt to return such premium after the fire was tantamount in law to an admission that the premium sought to be returned covered the property destroyed by fire.” (Stephens *783 Adamson Mfg. Co. v. Fireman’s Fund Ins. Co., 257 Ill. App. 443, 447).
Here, whatever attempts to cancel by exchange of checks for returned premiums occurred after the losses. Thus, they were too late.
After an insured loss occurs, the rights of the parties become fixed, so that a cancellation may not be effected retroactively. (Duncan v. New York Mut. Ins. Co., 138 N. Y. 88.)
Here, the incomplete cancellations had no retroactive effect.
“ If the insurance company desires to cancel it must, as we have held in the cases cited, not only give the notice required, but accompany it by the payment or tender of the pro rata amount of the unearned premium; it cannot legally demand of the insured the surrender of the policy and its cancellation until this is done.” (Buckley v. Citizens’ Ins. Co., 188 N. Y. 399, 404.)
1 ‘ The voluntary and unconditional surrender of the policy was as a matter of law a waiver of his right to treat the policy as in force until the company paid or tendered to him the unearned premium.” (Gately-Haire Co. v. Niagara Fire Ins. Co., 221 N. Y. 162, 170.)
Here, the policy was never voluntarily and unconditionally surrendered.
A policy of insurance may not be canceled without notice to the plaintiff, a named insured therein. (Wisconsin Barge Line v. Coastal Mar. Transp., 285 F. Supp. 264, 265, affd. 414 F. 2d 872.)
Here, Freedman (through Himmel) was acting as “ general agent ’ ’ for Public, and not for Fifty. Freedman knew that Fifty was a named insured on this policy because Freedman issued the policy for Public expressly stating that Fifty was an additional assured rather than just a loss payee. It was a clerical error on the part of Freedman in omitting to state Fifty’s address on the policy, especially so since the prior policy stated the correct address.
When the insurer fails to give notice of cancellation to one of two named insureds, the entire insurance policy continues in full force and effect as to all parties. (Wisconsin Barge Line v. Coastal Mar. Transp. Co., 285 F. Supp. 264.)
Here, the insurer sent two notices of cancellation. February 11, 1970, the first, was sent only to Benderson at its address, but never sent to Fifty at its address. Although on February 19, 1970 Benderson gave Fifty a copy of its notice, this did not bind Fifty because Benderson was neither Fifty’s agent nor Public’s agent. In any event, before the 20 days specified in the first notice had expired, on February 19, 1970 Fifty *784 requested from Freedman and on February 25, 1970 received from Public an extension of time which kept the policy viable.
February 26, 1970, a second notice of cancellation was sent from Public to Fifty at its address, but never sent to Benderson at its address.
Thus, Public never successfully canceled the policy because both cancellation notices were insufficient. Also, the second notice having been received one or two days after February 26, 1970, kept the policy alive until 20 days later, or until after the four losses had occurred.
A Louisiana statute, in point (La. Stat. A., § 22:636) entitled “Cancellation by insurer,” provides, in part: “A. Cancellation by the insurer of any policy which by its terms is cancellable at the option of the insurer * * * may be effected as to any interest only upon compliance with either or both of the following:
“(1) Written notice of such cancellation must be actually delivered or mailed to the insured or to his representative in charge of the subject of the insurance.”
(2) Loss payee named.
“As we interpret LSA-R.S. 22:636 the use of the words ‘ either or both ’ in regard to the insured and the loss payee means only the insured when he is the only one in interest, but notices must be sent to both the insured and the loss payee when such exists and is named in the policy.” (Skipper v. Federal Ins. Co., 238 La. 779, 790.)
Here, the policy names, as insured, Fifty “and/or ” Benderson. Strictly construing ‘ ‘ and/or ’ ’ the same as 1 ‘ either or both,” it follows that both named insureds are entitled to receive from the insurer a notice of cancellation; the sending of one notice to one of two insured is ineffectual cancellation.
As a Federal court put it: “ It’s quite clear from this testimony that the Greenwood Agency simply made a mistake and failed to send a notice of cancellation to one of the named assureds as required by law. This failure was fatal to the attempted cancellation of the policy. Under LSA-R.S. 22:636, notice must be sent to all parties at interest to effect cancellation of the policy. Skipper v. Federal Insurance Company, 238 La. 779, 116 So. 2d 520 (1959). In the absence of such notification, the policy was not effectively cancelled and thus must be considered to have been in full force and effect at the time of the loss on September 10, 1965, which was within the coverage period of the policy.” (Wisconsin Barge Line v. Coastal Mar. Transp. Co., 285 F. Supp. 264, 273, affd. 414 F. 2d 872).
*785 ‘ ‘ The law is quite clear that a cancellation of insurance is not effective, irrespective of the intention of the insured, until notice thereof is actually received either by the insurer or by his agent authorized to receive and accept such notice. ’ ’ (Louisiana Public Utilities Co. v. Atlas Assur. Co., 238 App. Div. 474, 477, affd. 263 N. Y. 595. See, also, Ann. 64 ALR 2d 982-1024; Sasmor v. Vivaudou, Inc., 200 Misc. 1020,1023-1024; Rose Inn Corp. v. National Union Fire Ins. Co., 133 Misc. 440.)
A provision in an insurance policy that requires that a notice should be ‘ ‘ given ’ ’ is not fulfilled until the party entitled to notice has actually “ received ” it. (Boyce v. National Commercial Bank & Trust Co. of Albany, 41 Misc 2d 1071, affd. 22 A D 2d 848.)
Here, Fifty never received the first notice of cancellation, although Benderson did; Benderson never received the second notice of cancellation, although Fifty did. No agency existed between them, thus, a receipt by one was not a receipt by the other.
A receipt means the act of receiving something, presupposing a sending, that is, the causing to be conveyed by an intermediary to a destination. (See The American Heritage of the English Language, 1969.) The acceptance of a copy of the first notice, here, by Fifty from Benderson was not a receipt, in the strict meaning of the word, from Public which did not send it to Fifty. Fifty did what a reasonably prudent person would do; it requested an extension of the policy’s term. Accordingly, Public sent the second notice that was never received by Benderson.
‘ ‘ A stipulation for notice to insured as a condition precedent to cancelation is for his benefit, and may be waived by him.” (Ann. 152 A. L. R. 95, 103. Buckley v. Citizens’ Ins. Co. of Mo., 188 N. Y. 399.)
In this case, neither insured Fifty nor Benderson waived the condition precedent to cancellation.
‘ ‘ The cancellation was not intended to reach back and absolve the defendant from any liability which it had already incurred. ’ ’ (Duncan v. New York Mut. Ins. Co., 138 N. Y. 88, 92.) “ The cancellation was made under a mistake of fact. It was at least made under a mistake of fact by the plaintiff, and, therefore, upon the return of the money paid to him he was entitled, under familiar principles of law, to have the cancellation rescinded.” (Ibid., p. 93.)
Here, on the calendar date of the third fire, March 4, 1970, a few hours after the loss, National, under a mistake of fact *786 demanded a return of the unearned premium, presupposing a valid cancellation. After the fourth loss of March 18, 1970, on May 12, 1970 Public directed Freedman to cancel the policy as of March 3, 1970, or the day before the third loss, and to pay /the return premium of $636, with full knowledge of the four losses. Then started the exchange of checks: May 26, 1970, Freedman sent its check to National, which cashed it; June 17, 1970, Public sent its check to National, which did not cash it; December 29, 1970, National sent its check to Freedman, which cashed it. The June 17, 1970 check was retained by National as evidence. Thus, National rescinded its cancellation.
Here the policy states: ‘ ‘ This policy shall be cancelled at any time at the request of the insured, in which case this Company shall, upon demand and surrender of this policy, refund the excess of paid premium above the customary short rates for the expired time.”
Public, in this case, failed to demand a surrender of the policy and National never surrendered it before the attempted refund of premium. •
‘ ‘ The companies were bound by the knowledge of their agent of the correct business address of the plaintiff and the notice to have effect should have been correctly addressed.” (Ellzey v. Hardware Mut. Ins. Co. of Minn., 40 So. 2d 24, 28 [La.].)
Here, Himmel’s knowledge of Fifty’s correct address was imputed to Freedman which acted for Public; thus, the first notice of cancellation was void on its face for failure to state Fifty’s correct address. Himmel admitted this to be a clerical error, an insufficient excuse.
“ Generally speaking, the question whether an innocent coinsured may recover on property insurance after another coinsured has committed some act of fraud, false swearing, or other misconduct depends on whether the interests of the coinsureds are joint or severable. ” (Ann. 24 ALR 3d 450.)
Here the policy states: ‘ ‘ This entire policy shall be void if, whether before or after a loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto. ’ ’
‘1 Unless otherwise provided in writing and added hereto, this Company shall not be liable to loss occurring (a) while the hazard is increased by any means within the control or knowledge of the insured.”
Here, the parties stipulated in open court that Benderson was not bound by any acts of Fifty alleged in Public’s affirmative *787 defenses of increased hazard, concealment or fraud. It follows that the interests of Fifty and Benderson as insureds were severable and not joint. They also stipulated that any act of National in accepting a refund of unearned premium was not binding on Fifty or Benderson. National was the first mortgagee, not a named insured.
When the “actual cash value” of premises under a New York State standard fire insurance policy is being proved, the trier of fact should listen to all logically pertinent evidence thereon, including “ original cost and cost of reproduction; the opinions upon value given by qualified witnesses; the declarations against interest which may have been made by the assured; the gainful uses to which the buildings might have been put; as well as any other fact reasonably tending to throw light upon the subject.” (McAnarney v. Newark Fire Ins. Co., 247 N. Y. 176, 184).
Here a plethora of evidence was received tending to prove actual cash value, including licensed independent insurance adjusters, general contractors, real estate appraisers, licensed real estate brokers, elevator experts, consulting civil and construction engineers, consulting electrical engineers, consulting mechanical engineers, city assessors, etc. Expert opinion testimony predominated.
In a case of multiple fires, no inference may be drawn as bearing on whether or not the plaintiff caused any or all of them, but the jury may consider prior fires and settlements therefrom as bearing upon any motive that he may have had bearing upon whether or not he caused subsequent fires. (Terpstra v. Niagara Fire Ins. Co., 26 N Y 2d 70, 76.)
Here, implicit in the verdicts of the jury were the findings that Fifty had no connection with the first two fires, but not so the third and fourth.
Generally, the plaintiff’s refusal to take a polygraph test in and of itself is meaningless, but the jury may consider all of the conversations relating to the polygraph test insofar as that has a bearing upon alleged admissions or other statements made by him. (Terpstra v. Niagara Fire Ins. Co., 26 N Y 2d 70, 76, supra.)
Here, Fifty’s president refused to take a polygraph test. It was not error to receive this in evidence with the appropriate charge that was given to the jury.
‘1 For many years instruments to detect deception have been used in industry with increasing frequency, but we have held their reliability has not yet been sufficiently established to give *788 them an evidentiary standing in the administration of the criminal law.” (People v. Leone, 25 N Y 2d 511, 513-514).
Here, it was not shown that a polygraph test of Fifty’s president was so reliable as to give it evidentiary standing in onr courts of law.
The insurer must pay the entire mortgage debt before it is entitled to an assignment of the mortgage debt; in this case such debt is over $4,000,000. (Massaro v. National Fire Ins. Co. of Hartford, 249 App. Div. 262, affd. 274 N. Y. 603; Eddy v. London Assur. Corp., 143 N. Y. 311; Young Men’s Lyceum, v. National Ben Franklin Fire Ins. Co., 177 App. Div. 351.)
The mortgagee clause in the insurance policy issued by Public provides, in part: 11 If this company shall claim that no liability existed as to the mortgagor or owner, it shall to the extent of payment of loss to the mortgagee, be subrogated to all of the mortgagee’s rights of recovery, but without impairing mortgagee’s right to sue; or it may pay off the mortgage debt and require an assignment thereof and of the mortgage. ’ ’
June 23, 1971, by stipulation of counsel in open court, all affirmative defenses in Public’s answers were withdrawn as to Benderson. Therefore, no rights of subrogation accrued to Public against Benderson by reason of the payment of loss to the mortgagee. This stipulation became the law of the case as to the stipulating parties. (Travelers Ins. Co. v. General Acc., Fire & Life Assur. Corp., 28 N Y 2d 458, 463.)
The loss-of-rents clause in the insurance policy herein states: ‘ ‘ This Company shall be liable for: a. the actual loss sustained by the insured resulting directly from such untenantability, but not exceeding the reduction in rents directly resulting from such untenantability, less charges and expenses which do not necessarily continue during the period of untenantability for only such length of time commencing with the date of the damage or destruction but not limited by the expiration of this policy, as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace the damage or destroyed property.”
As of December 4, 1969, the principal balance of the National mortgage was $565,281.72, and Fifty was in arrears in monthly payments to Benderson in the sum of $14,258.55, which, when added to amounts expended monthly by Benderson for interest and escrow since that time, exceed $90,000.
July 2, 1971, the jury returned verdicts: For Fifty against Public for $53,750 in Actions Nos. 1 and 2; for National against/ Public for $175,000 in Action No. 3 and $390,000 in Action No. 4; for Benderson against Public for $90,000 for lost rents in *789 Action No. 4; no cause of action against Fifty in Actions Nos. 3 and 4 for Public; no cause of action against Benderson in Actions Nos. 1, 2 and 3 for Public.
Fifty moves for an order setting aside so much of the verdict that awarded $175,000 in Action No. 3 to National; and for a judgment for Fifty, National and Benderson for $308,607.52 ; and for an order setting aside so much of the verdict that awarded $390,000 to National in Action No. 4 and awarded $90,000 to Benderson; and for a judgment for Fifty for $1,426,683.06 in Action No. 4; or, in the alternative the court should grant a new trial.
All of Fifty’s above motions are denied.
Benderson moves for an order setting aside the verdicts of no cause of action against it in Actions 1, 2 and 3, and directing judgment for it and against Public in the combined sum of “ $53,750 in Actions No. 1 and No. 2, in the sum of $175,000 in Action No. 3 ” and “ in the sum of $480,000 in Action No. 4,” all as a matter of law, or, in the alternative, that all judgments rendered in favor of National on its cross-claims against Public in Actions Nos. 1, 2, 3 and 4 provide that no rights of subrogation shall accrue to Public against Benderson by reason of the payment thereof.
Benderson’s above motion in the alternative, that all judgments rendered in favor of National on its cross claims against Public in Actions Nos. 1, 2, 3 and 4 provide that no rights of subrogation shall accrue to Public against Benderson by reason of the payment thereof, is granted; the remainder thereof is denied.
Public moves for an order setting aside so much of the verdict in excess of $511,250 awarded to National, and reducing the amount awarded of $565,000 to said amount, and setting aside so much of the verdict that awards $90,000 to Benderson.
Public’s above motion reducing the verdict awarded National to $511,250 is granted; the remainder thereof is denied.
The verdicts for National and against Public are $175,000 and $390,000, totaling $565,000; $53,750 having been paid, leaving a balance of $511,250.
Therefore, the final amounts owing are: From Public to National, $511,250, and from Public to Benderson, $90,000. Let the verdicts be corrected accordingly.