**In re ADLER, COLEMAN CLEARING CORP., Debtor.**

**Edwin B. MISHKIN, as SIPC Trustee for the Liquidation of the Business of Adler, Coleman Clearing Corp., Plaintiff,**

v.

**Daniel David ENSMINGER, et al., Defendants.**

**Bankruptcy No. 95–08203 (JLG). Adversary No. 97/8423A.**

United States Bankruptcy Court, S.D. New York.

March 13, 1998.

Cleary, Gottlieb, Steen & Hamilton, New York City, for Trustee.

Zeisler & Zeisler, P.C., Bridgeport, CT, for Claimants.

Kohrman Jackson & Krantz P.L.L., Cleveland, OH, for Claimant Norman Bennett.

Anthony Motta, New York City, for Claimant Dr. David Sulman.

S.W. Azriliant, P.C., New York City, for Claimants Georgios and Maria Kapsalis.

### DECISION ON TRUSTEE'S CROSS–MOTION FOR SUMMARY JUDGMENT UPHOLDING DETERMINATIONS CONCERNING CLAIMS OF CUSTOMERS WHO DID NOT RECEIVE TRADE CONFIRMATIONS

JAMES L. GARRITY, Jr., Bankruptcy Judge.

Adler, Coleman Clearing Corp. ("Adler" or "debtor"), formerly a registered broker-dealer and clearing firm, is subject to this liquidation proceeding under the Securities Investor Protection Act ("SIPA"). Hanover Sterling & Company ("Hanover") was formerly an introducing broker that cleared its trades through Adler prior to the commencement of this SIPA proceeding. Several former Hanover customers have filed SIPA customer claims against Adler to recover the securities and/or cash in their accounts at Adler. In or about December of 1996, Edwin B. Mishkin, Esq., as Securities Investor Protection Corporation ("SIPC") trustee for Adler's liquidation (the "trustee"), filed an Application for an Order Upholding the Trustee's Determination Denying Claims of Certain Customers Who Seek to Benefit from Fraudulent Transactions and Expunging Objections with Respect to those Transactions (the "Complaint").[1] Recently we denied a motion filed on behalf of 90 former Hanover customers whose claims are the subject of the Complaint for an order pursuant to Bankruptcy Rule 7012 and Fed. R.Civ.P. 12(b)(6) dismissing the Complaint for failing to state a claim upon which relief can be granted. *See* Memorandum Decision on Motion to Dismiss Complaint Seeking Judgment Upholding Trustee's Determination Concerning Certain Customer Claims, dated March 6, 1998 (the "Dismissal Decision"). In opposing that motion the trustee also cross-moved pursuant to Bankruptcy Rule 7056 and Fed.R.Civ.P. 56 for summary judgment upholding his determinations as to 65 of those former Hanover customers (the "Claimants").[2] We did not address the merits of cross-motion in the Dismissal Decision, but do so now. Claimants oppose the cross-motion. We grant it.

### Facts

We presume familiarity with the Dismissal Decision, which, among other things, discusses relevant background information and the trustee's allegations in the Complaint. As necessary, we reiterate some of that information herein.

On February 27, 1995 (the "Filing Date"), SIPC commenced a liquidation proceeding against debtor under 15 U.S.C. § 78eee(b) in the United States District Court for the Southern District of New York. District Judge Loretta A. Preska thereafter removed the liquidation proceeding to this court and appointed the trustee to liquidate debtor's assets.

Prior to the Filing Date, Adler was a registered broker/dealer of securities and a clearing firm for 42 introducing broker/dealers. It was also a member of SIPC, the National Securities Clearing Corporation, and the National Association of Securities Dealers, Inc. It held approximately 66,000 active customer accounts on the Filing Date.

Hanover was one of the introducing firms that cleared trades through debtor. It was a registered broker/dealer that acted as an

---

1. On consent of the parties and pursuant to a scheduling order entered herein, we deemed the application a complaint initiating an adversary proceeding under Part VII of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

2. Claimants' are identified in Exhibit "3" to the September 22, 1997 Declaration of James Donohue (the "Donohue Decl."). All but Norman Bennett, Georgios and Maria Kapsalis, Dr. Morris Sulman and Jay Harris submitted a joint response to the cross-motion. Those individuals filed separate objections.

underwriter and market maker for various securities, including, among others, All–Pro Products, Inc. units, American Toys, Inc. common stock, Envirometrics, Inc. common stock and warrants, Mister Jay Fashions Int'l, Inc. common stock and warrants, Panax Pharmaceutical Co. Ltd. units, Play Co. Toys common stock, warrants and units, Porter McLeod common stock and warrants and Eagle Vision, Inc. common stock (collectively, the "House Stocks"). Hanover was the initial underwriter for all of the House Stocks except the Eagle Vision, Inc. common stock, and all of the House Stocks traded on the NASDAQ market, except Eagle Vision, which was listed on the "pink sheets". A Fully Disclosed Clearing Agreement (the "Clearing Agreement") governed Adler's relationship with Hanover. *See* June 12, 1997 Declaration of James Corsiglia in Opposition to the Motion to Dismiss the Trustee's Application and in Support of the Trustee's Cross Motion for Summary Judgment (the "Corsiglia Decl.") Ex. A.

The trustee contends that in early 1995, Hanover was confronted with a growing crisis. As the primary market maker and an underwriter for the original public offering of the House Stocks, it owned many of the House Stocks itself and used them to meet its capital requirements. Also, many of its customers owned large quantities of House Stocks. According to the trustee, a group of brokerage houses and persons related to those firms engaged in illegal "short-selling" of the House Stocks beginning sometime prior to February of 1995. The trustee alleges that Hanover originally attempted to respond to this massive short-selling pressure by acceding to the short sellers' extortion demands, but that the short-selling continued despite substantial payments made to them by Hanover. The concerted short-selling of the House Stocks caused downward pressure on their prices, and, according to the trustee, Hanover was aware that the selling could eventually force it into bankruptcy and result in enormous losses for its customers. The trustee contends that to support the price of the House Stocks, Hanover escalated its efforts to sell them to its retail customers, and began to record "phony purchases" by retail customers from its proprietary trading accounts. While Hanover's customers allegedly did not authorize these "buys", Hanover allegedly created debits in their accounts that they could never repay. Those debits purportedly were secured only by the artificially inflated value of the House Stocks.

The trustee alleges that beginning on or about Monday, February 13, 1995—two weeks before Adler closed its doors—Hanover began to dump stock in its customers' accounts without informing them. Hanover's trading desk processed "buy" tickets for those transactions and Adler cleared the "buys". The Hanover customers who "bought" the House Stocks did not have the cash in their accounts to pay for them, and Adler automatically debited those customers' accounts in an amount equal to the price of the House Stocks. Adler also automatically credited Hanover's proprietary accounts with the proceeds, and Hanover was able to use that credit to "purchase" more House Stocks. The trustee contends that through this allegedly illusory buying and selling, Hanover temporarily supported the markets for the House Stocks, and thereby maintained its minimum net capital requirements.

The trustee asserts that by Friday, February 17, 1995, key Hanover officials understood that Hanover could not absorb the massive short-selling. They allegedly realized that Hanover's days were numbered, but continued to create fake "buys" of the House Stocks to prevent immediate depletion of Hanover's capital reserves, while simultaneously "selling" the House Stock out of the accounts of certain favored customers, and utilizing the proceeds of the "sales" to "buy" well-known securities with real value, including Apple, Dell, Ford, Cisco Systems, IBM, AT & T, Birmingham Steel and Microsoft (designated by the trustee and referred to herein as "Blue Chips"). In as much as there never was actually any cash to acquire the Blue Chips, but merely the proceeds of House Stocks whose prices were artificially and fraudulently inflated by Hanover's machinations, the trustee maintains that the Blue Chip "buys" that were used to benefit Hanover's favored customers were fake, and that the "sale" of the House Stocks was part of a scheme to defraud Adler and SIPC.

The trustee contends that between February 17 and 24, 1995, Hanover customers were forced to "buy" without their knowledge and against their wishes at least $45.1 million of House Stock at prevailing prices. For many Hanover customers, these alleged purchases were the only transactions ever recorded in their accounts. According to the trustee, at the same time, Hanover "sold" $31.5 million in House Stocks from the accounts of Hanover's favored customers, thereby replacing their holdings in House Stocks with cash. However, because SIPA only provides cash coverage up to $100,000, Hanover used the "cash" credits in those accounts to purchase $18.7 million in Blue Chips. The trustee alleges that most, if not all of Hanover's customers did not authorize the Blue Chip purchases, and that Hanover effected those transactions to give the favored customers the greatest and highest priority claim possible under SIPA.

Each Claimant was one of Hanover's favored customers. Some, but apparently not all, of them executed standardized customer agreements (the "Account Agreements") with Adler when they opened accounts at Hanover. *See* Statement of Edwin B. Mishkin, Trustee for the Liquidation of Adler, Coleman Clearing Corp., pursuant to Local Rule 7056–1 ("Trustee 7056–1") ¶ 5; Customers' Statement of Material Facts as to which There Are Genuine Issues to Be Tried pursuant to Local Rule 7056–1 ("Claimant 7056–1") ¶ 1; Corsiglia Decl.Ex. J. Those agreements provide in relevant part that "[t]he confirmation of the receipt or execution of an order shall be conclusive or binding upon the undersigned if the undersigned does not object thereto in writing within five business days after Adler Coleman has sent the confirmation to the undersigned by mail or otherwise." Account Agreements ¶ 8(a). On February 24, 1995, the final day of Hanover's operation, Hanover "sold" the House Stocks in Claimants' accounts and used the proceeds to purchase Blue Chips (the "2/24 Trades").

Pursuant to procedures established by SIPA and our March 10, 1995 order, notice of the pendency of this SIPA case was given to Adler's customers, who then filed claims against debtor for whatever cash or securities they believed were in their accounts. Each Claimant filed such a claim. After reviewing those claims and debtor's books and records, the trustee rejected Claimants' and other former customers' claims on the basis that the series of transactions involving the sale of the House Stocks and the purchase of the Blue Chips was part of a massive fraud. Claimants objected to the trustee's determination as to their claims and in accordance with our March 10 order, the trustee filed the Complaint. Therein, he alleges, among other things, that the final week trades are illegal under federal securities laws, the criminal provisions of SIPA and the Martin Act (New York's blue sky law), and that they are avoidable as fraudulent transfers under §§ 548 and 544 of the Bankruptcy Code and the New York Debtor and Creditor Law. Claimants are among the 90 customers who moved to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6). Each asserts a claim against debtor for either cash or securities based upon the 2/24 Trades. We denied the motion to dismiss. In opposing the 12(b)(6) motion, the trustee also cross-moved against Claimants for summary judgment upholding his determinations with respect to their claims. We consider the merits of that motion herein.

### Discussion

We base our subject matter jurisdiction of this proceeding on 15 U.S.C §§ 78eee(b)(2)(A) and (b)(4) and the district court order dated February 27, 1995 referring and removing debtor's case to this court. This motion is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A).

SIPA § 78fff–2 is entitled "Payments to customers" and provides in relevant part as follows:

After receipt of a written statement of claim pursuant to subsection (a)(2) of this section, the trustee shall promptly discharge, in accordance with the provisions of this section, all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash, by the delivery of securities or the making of payments to or for the account of such customer (subject to the provisions of subsection (d) of this section and section 78fff–

3(a) of this title) insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee. For purposes of distributing securities to customers, all securities shall be valued as of the close of business on the filing date.

\* \* \*

15 U.S.C. § 78fff–2. There is no dispute that claimants are "customers" under SIPA. *See* 15 U.S.C. § 78lll.

The SIPC Rules, 17 C.F.R. §§ 300.501 through 300.503 (the "Series 500 Rules"), determine whether a "customer" has a claim for cash or a claim for securities under SIPA. The SEC promulgated those rules in 1988 and they have the force and effect of law. *See In re Adler, Coleman Clearing Corp.,* 195 B.R. 266, 275 (Bankr.S.D.N.Y.1996). As relevant, SIPC Rule 300.501 provides that:

(a) Where a SIPC member ("Debtor") held securities in an account for a customer, the customer has a "claim for cash" with respect to any authorized securities sale:

(1) If the Debtor has sent written confirmation to the customer that the securities in question have been sold for or purchased from the customer's account; or

(2) Whether or not such a written confirmation has been sent, if the securities in question have become the subject of a completed or executory contract for sale for or purchase from the account.

17 C.F.R. § 300.501. Rule 300.502 provides in pertinent part that:

(a) Where the Debtor held cash in an account for a customer, the customer has a "claim for securities" with respect to any authorized securities purchase:

(1) If the Debtor has sent written confirmation to the customer that the securities in question have been purchased for or sold to the customer's account; or

(2) Whether or not such a written confirmation has been sent, if the securities in question have become the subject of a completed or executory contract for sale for or purchase from the account.

17 C.F.R. § 300.502. In addition, Rule 300.503 provides in relevant part that

"[n]othing in these Series 500 Rules shall be construed as limiting the rights of a trustee in a liquidation proceeding under the Act to avoid any securities transaction as fraudulent, preferential, or otherwise voidable under applicable law". 17 C.F.R. § 300.503.

Thus, Claimants are entitled to recover the proceeds of the 2/24 Trades if either (i) debtor "sent written confirmation" to them of the trades, or (ii) the Blue Chips became "the subject of a completed or executory contract" for the purchase or sale of such securities. 17 C.F.R. §§ 300.502.

The trustee denies that Adler sent Claimants "written confirmation" of the 2/24 Trades. To that end, he contends as follows. In the ordinary course, every night at the close of trading, Adler, as clearing agent, sent the tickets confirming Hanover trades on computerized tape to Imtech Corp. ("Imtech"), a third-party vendor. Imtech would then print the confirmations from the tape and create a micro-fiche record of it. The following day, Imtech would mail them to the customers, return hard-copies of the confirmations to Adler for hand delivery to nearby brokers (including Hanover), send a hard-copy by messenger service to other brokers, and return the micro-fiche copy to Adler. *See* Transcript of May 2, 1997 Deposition of James J. Donohue ("Donohue Dep.") (Exh. K to Corsiglia Decl.) 10–11; Transcript of July 23, 1997 Deposition of Nicholas Piazza ("Piazza Dep.") 49, 53–64 (Exhibit P to the September 23, 1997 Declaration of James Corsiglia in Support of the Trustee's Cross Motion for Summary Judgment (the "Supp. Corsiglia Decl.")); *see also* Trustee 7056–1 ¶ 6; Claimant 7056–1 ¶ 2. The trades settled five days after the trade date, upon payment of cash and delivery of the securities. *See* Piazza Dep. 113–115. If Adler determined to "cancel" a trade already confirmed to a customer because the trade was duplicated or somehow erroneously processed, it would make an appropriate entry in its computer system and generate a second confirmation canceling the trade for transmission to the customer involved. *Id.* at 76–77.

At the close of trading on February 24, Adler generated and sent the computer tape

of the tickets confirming the days' trades to Imtech. However, Imtech did not mail or otherwise disseminate them because the next day, before it could do so, an Adler employee retrieved them from Imtech, in accordance with instructions that he received during a meeting of Adler personnel that took place on the evening of February 24. Piazza Dep. 72–75. Adler also retrieved the confirmation hard-copies that would otherwise have been sent to brokers, including Hanover. *Id.* at 62–63.

With the exception of Norman Bennett, Dr. Sulman, Georgios and Maria Kapsalis, and Jay Harris, Claimants concede that they did not receive confirmations for the 2/24 Trades. The trustee also contends that because Hanover and Adler ceased operating prior to settlement of the Blue Chip "buys", no Blue Chip securities were ever delivered to Adler, Hanover or Claimants. However, Norman Bennett asserts that the trustee's records reflect that Adler received dividends on IBM stock that it holds for Bennett's account.

As relevant here, the Clearing Agreement provides that debtor, as Hanover's "agent" shall, among other things, "[c]lear and settle, and if requested to do so, execute transactions" upon Hanover's instructions in customer accounts introduced by Hanover, prepare and mail confirmations to the introduced accounts, settle contracts and transactions in securities between (i) Hanover and other brokers and dealers, (ii) Hanover and the introduced accounts, and (iii) Hanover and third persons, and perform cashiering functions for the introduced accounts, including receiving and delivering securities purchased or sold, and receiving payments therefor. Clearing Agreement ¶ 3(a). Paragraph 3(b) of the agreement provides that

> Notwithstanding anything contained in Paragraph 3(a) to the contrary, [Adler] may, [if it has reasonable grounds to believe] such action is necessary to protect its interests, refuse to open an account for a specific customer; close an account already opened; refuse to confirm a transaction; cancel a confirmation of a transaction; refuse delivery or receipt of any cash, securities or other property; refuse

> to clear any transaction executed by [Hanover]; or refuse to execute any transaction for an Introduced Account (notwithstanding its acceptance by the Introducing Firm pursuant to Paragraph 5(d)). [Adler] shall use its best efforts to notify [Hanover] of any such action in advance thereof if it is able to do so without jeopardizing its economic interests....

*Id.* ¶ 3(b) (all bracketed material in original except for names).

The trustee contends that when Adler picked up the confirmations for the 2/24 Trades from Imtech on February 25, it invoked its rights under the Clearing Agreement to refuse to confirm the 2/24 Trades and thereby prevented those transactions from being the subject of any "completed or executory" contract with Adler within the contemplation of the Series 500 Rules. Thus, he asserts that he is entitled to summary judgment upholding his determinations as to those claims and expunging Claimant's objections as a matter of law.

Fed.R.Civ.P. 56(c) states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Rule 56(c)). A fact is "material" only if it will affect the outcome of a lawsuit under applicable law, and a dispute over a material fact is "genuine" if the evidence is such that a reasonable finder of fact court return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *Rovtar v. Union Bank of Switzerland*, 852 F.Supp. 180, 182 (S.D.N.Y.1994). in assessing the merits of a summary judgment motion, we must view the record in the light most favorable to the non-moving party. *See, e.g., Nat'l Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 203 (2d Cir.1989). We must determine " '[w]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law.' " *Kulak v. City of New York,* 88 F.3d 63, 70 (2d Cir.1996) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 251–52, 106 S.Ct. at 2512); *see also Heyman v. Commerce Industry Insur. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975) ("on a motion for summary judgment the court cannot try issues to be tried"). The movant must establish the absence of an issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

■ Claimants object to the cross-motion as being procedurally improper. They contend that although the trustee was aware of the facts and legal conclusions he alleges in support of this motion when he filed the Complaint, he failed to plead them. They maintain that this cross-motion is inconsistent with the memorandum of law filed by the trustee in support of the Complaint (the "Trustee Mem.") because the trustee asserts therein that he "confirmed" the trades and is seeking to cancel them in accordance with the terms of the Clearing Agreement.[3] For them, the trustee is improperly seeking to amend the Complaint by asserting in the motion that Adler canceled the 2/24 Trades before the SIPA filing. They argue that the trustee is, in effect, asserting a new and inconsistent cause of action in violation of Fed.R.Civ.P. 15(a).

As the trustee correctly notes, the statute of frauds defense he asserts herein is not a cause of action at all. It is a legal argument the trustee advances in support of his determinations with respect to the claims. Although the parties agreed to treat the application as a Complaint, neither the Complaint nor the Trustee Mem. contains causes of action. Even assuming, *arguendo,* that the statute of frauds argument is a new cause of action, we will treat the cross-motion as an application pursuant to Fed.R.Civ.P. 15(a) to amend the Complaint. *See, e.g., Countryside Oil Co., Inc. v. Travelers Insurance Co.,* 928 F.Supp. 474, 480 n. 4 (D.N.J.1995) (where complaint did not raise defenses of equitable estoppel and reformation, but plaintiff raised defenses in brief opposing defendant's motion for summary judgment, court treated brief as motion for leave to amend).

Bankruptcy Rule 7015 makes Fed.R.Civ. P.Rule 15 applicable herein. In part Rule 15(a) states as follows:

> A party may amend the party's pleadings once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only be leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires....

Fed.R.Civ.P. 15(a). The grant or denial of a motion for leave to amend a complaint is within the discretion of the bankruptcy court. *Swanson v. First Wisconsin Financial Corp. (In re Universal Foundry Co.),* 163 B.R. 528, 541 (E.D.Wis.1993), *aff'd,* 30 F.3d 137 (7th Cir.1994). Absent undue delay, bad faith or dilatory motive by the party seeking leave to amend, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party or futility of the amendment, the "mandate [of Rule 15(a) ] is to be heeded." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *accord Tokio Marine & Fire Ins. Co. v. Employers Ins. of Wausau,* 786 F.2d 101, 103 (2d Cir.1986); *Concord*

---

3. The Trustee Mem. states in relevant part as follows:

> Even though Adler "confirmed" the transactions in the belief the Trades were legitimate, it has the right to cancel those confirmations under the Clearing Agreement. (In fact, most of the Trades never settled.) Although Adler sent most confirmations to both buyers and Sellers, "if it has reasonable grounds to believe such action is necessary to protect its interest," under the Clearing Agreement, Adler is entitled

> to "cancel a confirmation of a transaction [and] ... refuse to clear any transaction executed by the introducing firm." ... Under these circumstances, cancellation of the confirmation of fictitious transactions is clearly necessary to protect the interests of the estate, and the Trustee hereby asserts his right to cancel the Claimants' Trades and deny their claims on that basis.

> Trustee Mem. at 13–14 (citations and footnotes omitted).

*Asset Mgmt., Inc. v. Intercredit Corp.,* No. 92 Civ. 7756, 1994 WL 176975, *2 (S.D.N.Y. May 5, 1994); *see also Kurtzman v. Charles (In re Walter T. Murphy, Inc.),* No. 94 Civ. 8094, 1995 WL 35672, *2 (S.D.N.Y. Jan. 30, 1995) (if the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, it should be afforded an opportunity to test its claims on the merits); *see generally* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1484 (2d ed.1990). Claimants do not argue that they will be prejudiced in any way if we permit the trustee to amend the Complaint to add a statute of frauds defense. The trustee served his cross-motion approximately 3½ months before we heard argument on the motions. Claimants have had ample time to address the matters raised therein. We find no merit to Claimants' procedural objection and, as necessary, grant the trustee leave to amend the Complaint.

Claimants next argue that we must deny the cross-motion because the declaration submitted by Jay Zaremba (the "Zaremba Decl."), Adler's senior vice president of operations and later its chief operating officer, is the only evidence upon which the motion is based, Zaremba recanted his testimony at a subsequent deposition, and other Adler officers have testified that the 2/24 Trades were not canceled. Zaremba's testimony is not the trustee's only evidence in support of this motion. *See* Corsiglia Decl. (and attachments); Supp. Corsiglia Affid. (and attachments). Zaremba's allegedly inconsistent testimony and that of certain other Adler officers concerns whether Adler canceled the 2/24 Trades in accordance with its customary practices. The evidence shows, and the trustee concedes, that Adler did not cancel them. However, as we discuss below, that is irrelevant because we find that Adler never confirmed the 2/24 Trades.

Claimants also argue that the trustee cannot take any action under the Clearing Agreement to cancel the 2/24 Trades and that we must deny this motion because the trustee did not assume the agreement pursuant to § 365 of the Bankruptcy Code, and, as such, it was deemed rejected 60 days after SIPC commenced this liquidation proceeding.

*See* 11 U.S.C. § 365(d)(1). The trustee denies that the Clearing Agreement is an executory contract, arguing that because Hanover breached the agreement prior to the Filing Date, debtor had no obligation to perform under it. Thus, he argues that the agreement cannot be assumed or rejected under § 365 of the Bankruptcy Code and that, in any event, he properly "nullified" the 2/24 Trades.

■ Whether the Clearing Agreement was deemed rejected 60 days after the Filing Date is irrelevant because, as we explain below, we find, as a matter of law, that Adler's retrieval of the confirmations prevented the 2/24 Trades from becoming the subject of completed or executory contracts with Adler.

Claimants maintain that the trustee's cross-motion fails as a matter of law because, absent intentional fraud on their part, the trustee has no right to cancel or avoid their executed trades. We have already rejected this argument for the reasons stated in the Dismissal Decision. *See* Dismissal Decision pp. 35–48 ( finding that 2 /24 Trades did not involve "settlement payments" or "margin payments" within the meaning of § 546 of the Bankruptcy Code such that they could only be avoided if intentionally fraudulent).

Claimants assert that the following disputed material issues of fact preclude the entry of summary judgment in the trustee's favor:

(1) whether all customers who opened accounts with Hanover were required to execute Account Agreements;

(2) whether the computer tape sent to Imtech contained a record of "alleged", as opposed to actual, trades and whether the trades were "booked" at Hanover, as opposed to Adler;

(3) whether the House Stocks sold by claimants to Hanover on February 24, 1995 were effectively delivered to Hanover by Adler from the moment those trades were "booked" out of claimants' accounts and into Hanover's proprietary account, and whether payment for claimants' purchases of Blue Chips was similarly made by booking the pur-

chases into their accounts and booking the payments out of their accounts with cash generated from the sale of their House Stocks;

(4) whether there is any competent evidence that Adler was concerned about unusual trades in Hanover's final hours of existence, and whether Adler took action to prevent the 2/24 Trades from clearing; and

(5) why Adler contacted Imtech and directed that the trade confirmations be sent to it.

None of the factual issues disputed by claimants precludes us from granting the trustee's motion. The Account Agreement is significant because it established when (and the means by which) Adler and Hanover's customers became contractually bound—namely, upon receipt of confirmation of a trade. *See* Account Agreements ¶ 8(a). The uncontradicted evidence is that to confirm the trades that it cleared, Adler caused Imtech to mail written trade confirmations to customers. Claimants have not submitted any evidence showing that Adler utilized some other procedure to confirm trades, or that Adler failed in any way to comply with the terms of the Account Agreements when clearing the trades. Without some evidence to show that binding contracts were created with Adler by some means other than written confirmation of a trade, those Claimants cannot defeat a motion for summary judgment. *See* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial"); *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) ("The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture"). Accordingly, that certain Claimants did not execute Account Agreements does not bar summary judgment.

Likewise, whether the computer tape that Adler sent to Imtech contained a record of actual trades that had already been booked by Hanover as opposed to "alleged" trades that were booked by Adler, and whether the securities allegedly bought and sold pursuant to the 2/24 Trades or their proceeds were effectively delivered when the trades were "booked" (items 2 and 3 above) is irrelevant. Regardless of which entity "booked" the trades and when, the Series 500 Rules govern whether a "customer" has a claim under SIPA for cash or securities. Those Rules require either confirmation of a trade or the existence of an executory or completed contract for the purchase or sale of securities. As we discuss below, the record is sufficient to conclude as a matter of law that Claimants do not satisfy either requirement.

As relevant here, the evidence concerning the events that took place at Adler, Hanover and Imtech on February 24 and 25, 1995 is as follows. John Paul Devito, Adler's senior vice president in charge of marketing, testified during his deposition that he noticed that the prices of the House Stocks were dropping "precipitously" sometime during the morning of February 24, 1995, and that he reported this trading activity to Ed Cohan, Adler's chief executive officer, who instructed him to go over to Hanover's offices and "report back". Transcript of August 13, 1997 Deposition of John Paul Devito ("Devito Dep.") 113–14 (Supp. Corsiglia Decl.Exh. Q). Devito stated that upon arriving at Hanover's offices, he encountered "pandemonium", and after attempting to convene a meeting of the brokers in an effort to "control panic", he was physically attacked by Roy Ageloff of Hanover. *Id.* at 113–16. Devito left the premises immediately thereafter, and returning to Adler's offices at approximately 1:00 p.m., reported what he had seen to Cohan. *Id.* at 116. Devito testified that he was not present at any meetings convened at Adler that day to discuss the ramifications of his report. *Id.* at 119.

Nicholas Piazza, Adler's vice president of purchasing and sales, testified that he was told to retrieve the confirmations from Imtech at a meeting held on the evening of February 24, 1995. Piazza Dep. 72. Accord-

ing to Piazza, in attendance were Piazza, Cohan, William Giordano, Zaremba and Charles Sanacore, Adler's senior vice president in charge of correspondent services. *Id.* at 72 and 83; *See* Transcript of Deposition of Jay Zaremba ("Zaremba Dep.") 23 (Supp. Corsiglia Decl.Exh. O). Piazza, who was not present during the entire meeting, stated that he was told at the meeting to retrieve the confirmations and that he "believe[s] that the reason was [that] unauthorized or fraudulent trades were being done that day". *Id.* at 73–74. Piazza does not recall who at the meeting instructed him to retrieve the confirmations or told him the reason for doing so. *Id.* at 74. Piazza further testified that he telephoned Barry Shear of Imtech on the evening of February 24, 1995 to inform him that Piazza needed to retrieve the confirmations. *Id* . at 82. Zaremba testified that he was not at the February 24 meeting. Zaremba Dep. 208. The trustee did not submit any testimony from anyone present at the meeting other than Piazza attesting to the reasons for retrieving the confirmations.

As with Claimants' allegations regarding when the 2/24 Trades were "booked" and by whom, we find any dispute concerning Adler's intent in retrieving the confirmations irrelevant in determining whether Claimants have a preferred "customer" claim for cash or securities under SIPA. It may be relevant in determining whether Adler had "reasonable grounds" to "refuse to confirm" the trades in accordance with § 3(a) of the Clearing Agreement. However, any liability that may be incurred by Adler arising from its alleged failure to comply with the terms of the Clearing Agreement would not constitute a SIPA "customer" claim. *See In re Adler, Coleman Clearing Corp.,* 198 B.R. 70, 74 (Bankr.S.D.N.Y.1996) (even assuming truth of investor's claim that debtor-clearing firm's failure to send investor monthly account statements or relevant trade confirmations breached account information and customer agreement between debtor, introducing broker, and investor, and assuming that debtor could be held accountable for damages investor suffered, resulting claim would not be SIPA "customer claim"; SIPA does not protect customer claims based on fraud or breach of contract); *In re MV Securities, Inc.,* 48 B.R. 156, 160–61 (Bankr.S.D.N.Y. 1985) (SIPA does not protect customer claims based on fraud or breach of contract); *S.E.C. v. Howard Lawrence & Co., Inc.,* 1 B.C.D. 577, 579 (Bankr.S.D.N.Y.1975) (same); *see also S.E.C. v. S.J. Salmon & Co., Inc.,* 375 F.Supp. 867 (S.D.N.Y.1974) (investor's recision claim based upon fraudulent inducement not a SIPA customer claim; customer would have to pursue claim against broker as a general unsecured creditor).

The evidence does not support the contentions of Norman Bennett, the Kapsalis', Dr. Sulman and Jay Harris that they received confirmation of their respective 2/24 Trades. Mr. Bennett obtained a copy of his trade confirmation from the trustee in discovery conducted after the Filing Date. *See* Memorandum of Defendant Norman Bennett in Opposition to Trustee's Cross Motion for Summary Judgment at 5. The confirmation was never sent by Adler or Imtech. Likewise, the Kapsalis' obtained the micro-fiche copy of the unmailed confirmation that they rely upon from the trustee's discovery room after the Filing Date. *See* Declaration of Patricia Stinziano regarding Claims of Maria and Georgios Kapsalis, dated September 29, 1997. Dr. Sulman apparently had two different accounts at Adler: Account No. 38–00477–8 and Account No. 37–01526–1. The trustee does not dispute that he received confirmation for trades effected in the former, such that those trades are not covered by this summary judgment motion. However, as with Mr. Bennett and the Kapsalis', Sulman must have obtained the confirmation for trades effected in the latter account from the trustee's files sometime after the Filing Date since each of its pages has a line drawn through it. As Donohue opened each of the previously sealed confirmations during his deposition, he drew a line through each of the pages to indicate that the document was produced from the trustee's files. *See* Donohue Dep. 41. Jay Harris relies on account statements received from Hanover and Adler. Like the other Claimants, however, the confirmation of his 2/24 Trades was never sent by Adler or Imtech. *See* Donohue Dep. 61.

Under SIPC Rules 300.501(a)(1) and 300.502(a)(2), a customer will have a "claim for cash" and a "claim for securities", respectively, if the debtor has sent "written confirmation to the customer that the securities in question" have been purchased or sold. Although Adler initially directed Imtech to mail Claimants confirmation of the 2/24 Trades, it retrieved them before Imtech mailed them. It is irrelevant that the confirmations actually exist or that debtor's computer system or other books and records reflect that Hanover and Adler processed or "booked" the 2/24 Trades. Confirmation of a trade is the equivalent of Adler's acceptance of an offer. General principles of contract law dictate that without appropriate communication of that acceptance, no contract is formed. *See Slobojan v. U.S.*, 136 Ct.Cl. 620 (Ct.Cl.1956); *Fowler–Curtis Co. v. Dean*, 203 A.D. 317, 196 N.Y.S. 750 (N.Y.A.D.1922); *Sasmor v. V. Vivaudou, Inc.*, 200 Misc. 1020, 103 N.Y.S.2d 640 (N.Y.Sup.Ct.1951); *Antonucci v. Stevens Dodge, Inc.*, 73 Misc.2d 173, 340 N.Y.S.2d 979 (N.Y.City Civ.Ct.1973); *Richman v. Brookhaven Servicing Corp.*, 80 Misc.2d 563, 363 N.Y.S.2d 731 (N.Y.Dist.Ct.Suff.Cty.1975); *see also Municipal Consultants & Publishers, Inc. v. Town of Ramapo*, 47 N.Y.2d 144, 148, 417 N.Y.S.2d 218, 219, 390 N.E.2d 1143 (N.Y.1979) ("Generally, where the parties contemplate that a signed writing is required there is no contract until one is delivered"). As discussed below, New York law specifically applicable to securities transactions does not change this result.

Claimants contend that we must deny this motion because the confirmations Imtech generated from Adler's computer tape, but never disseminated, and the information contained in Adler's books and records satisfies the statute of frauds applicable to securities transactions.

In New York, § 8–319 of New York's version of the Uniform Commercial Code governs the enforceability of a contract for the sale of securities. That section is entitled "Statute of Frauds" and provides as follows:

A contract for the sale of securities is not enforceable by way of action or defense unless

(a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; or

(b) delivery of a certificated security or transfer instruction has been accepted, or transfer of an uncertificated security has been registered and the transferee has failed to send written objection to the issuer within ten days after receipt of the initial transaction statement confirming such registration or payment has been made but the contract is enforceable under this provision only to the extent of such delivery, registration or payment; or

(c) within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten days after its receipt; or

(d) the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price.

N.Y.U.C.C. § 8–319 (McKinney 1990). The trustee argues that Claimants cannot satisfy the statute of frauds, and thereby demonstrate that they have an enforceable contract (executory or otherwise), because (i) none of them received a printed confirmation, as required by § 8–319(a), (ii) the 2/24 Trades did not involve "certificated securities", "transfer instruction[s]" or the registration of uncertificated securities in the name of the new owner, within the meaning of §§ 8–319(b) and 8–308(4)[4] and other applicable law, (iii) § 8–319(c) facilitates a broker's ability to enforce transactions against its customers and

---

**4.** That section defines an "instruction" as "an order to the issuer of an uncertificated security requesting that the transfer, pledge or release from pledge of the uncertificated security therein be regulated". N.Y.U.C.C. § 8–308(4).

is therefor not implicated, and (iv) Claimants cannot satisfy § 8–319(d) because the trustee never admitted that the trades were valid contracts. He also claims that even if Claimants had printed confirmations, none of the trades is enforceable under the UCC, which "imposes an obligation of good faith in [the] performance or enforcement [of every contract or duty subject to the UCC]", *see* N.Y.U.C.C. § 1–203, because under applicable agency law, Claimants, as principals, are charged with the bad faith actions of their agent Hanover.

Claimants maintain that a contract between a customer and a broker is completed when the customer gives the broker trading instructions. They also assert that their failure to receive trade confirmations is irrelevant because the fact that they exist and bear Adler's name establishes an executory contract.

NY–UCC § 8–319(a) does not specify whether delivery of a "writing" is required before a contract for the sale of securities is enforceable. It provides merely that "there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker". Claimants urge us to interpret the statute's silence on this point to mean that delivery of a writing is not required. For support, they rely on *Transit Advertisers Inc. v. New York, N.H. & H.R. Co.*, 194 F.2d 907 (2d Cir.), *cert. denied*, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952), *Schiff v. Kirby*, 22 Misc.2d 786, 194 N.Y.S.2d 695 (Sup.Ct.West.Cty.1959), *Schwartz v. Greenberg*, 199 Misc. 117, 102 N.Y.S.2d 367 (Sup.Ct.West.Cty.), *rev'd*, 279 A.D. 750, 108 N.Y.S.2d 421 (N.Y.A.D.1951), *rev'd*, 304 N.Y. 250, 107 N.E.2d 65 (N.Y.1952), and two treat-

ises, New York Jurisprudence and the Restatement. Those authorities, however, do not support their position.

*Transit Advertisers* involved an alleged advertising contract, and the court was construing the statute of frauds under New York Personal Property Law [5] and the Connecticut General Statutes [6] rather than § 8–319. 194 F.2d at 908–09. In holding that a signed memorandum was admissible evidence of a previous oral agreement, the court stated as follows:

> Delivery of the signed memorandum is not necessary to make it effective as evidence of the previous oral contract unless, by its terms, the oral contract is not to be consummated until a memorandum has been delivered. Absent that condition upon the binding effect of the oral contract, nondelivery does not affect the probative value of the signed memorandum to satisfy the requirements of the statute of frauds.

*Id.* at 910. Here, the Account Agreements state that trades confirmed by debtor are binding upon it unless the customer objects in writing "within five business days after [debtor] has sent the confirmation to the undersigned by mail or otherwise." Account Agreements ¶ 8(a). Thus, as to Claimants who executed Account Agreements, debtor's contractual obligation expressly depended upon its transmission of written confirmation. We reach the same conclusion, moreover, with respect to any Claimants who did not execute an Account Agreement. As discussed previously, they have not submitted any evidence to show, nor do they even suggest, that debtor intended to become contrac-

---

**5.** At that time, New York's statute of frauds provided as follows:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking; (1) By its terms is not to be performed within one year from the making thereof, or the performance of which is not to be completed before the end of a lifetime
> ...

N.Y.Pers.Prop.L. ch. 41, § 31 (repealed 1963). That statute was superseded by N.Y.G.O.L. § 5–701 (McKinney 1997) and N.Y.U.C.C. § 8–319.

**6.** Section 52–550 of the Connecticut General Statutes provides in relevant part that:

> No civil action shall be maintained ... upon any agreement that is not to be performed within one year from the making thereof, unless such agreement, or some memorandum thereof, be made in writing, and signed by the party to be charged therewith, or his agent....

C.G.S.A. § 52–550 (West 1997). As in New York, a special "statute of frauds" now applies in Connecticut to contracts for the sale of securities. *See* C.G.S.A. § 42a–8–319 (West 1997).

tually obligated by some means other than the transmission of written confirmation.

In *Schiff,* the court had to determine the enforceability of an oral contract and a subsequent written memorandum pursuant to which the parties agreed to share any profits arising from syndication of a comic strip. The court construed the statute of frauds contained in New York's Personal Property Law and found that the contract was enforceable, and that delivery of the written memorandum was not necessary to satisfy the statute of frauds. 22 Misc.2d at 789, 194 N.Y.S.2d at 700. Significantly, however, unlike here, there is no indication that the parties in *Schiff* intended that the existence of a contract between them be evidenced by delivery of written confirmation of a trade.

*Schwartz* was in fact reversed by the New York State Court of Appeals on precisely this point.[7] In that case, the parties convened a meeting with their attorneys for the purpose of executing a contract for the purchase and sale of certain stock. Both executed the contract on separate originals, but because the form of payment was unacceptable to the seller, the closing was postponed and both parties retained their signed originals. Upon reconvening the meeting, the purchaser indicated that he had changed his mind and refused to proceed with the transaction. Finding that there was no evidence to show that the buyer ever delivered the contract to the seller, the trial court dismissed the seller's complaint. *Schwartz,* 304 N.Y. at 254, 107 N.E.2d at 67. The Appellate Division reversed, ruling that the evidence established that there was a valid and binding oral agreement between the parties, and that the failure to deliver a signed copy of the agreement could not defeat its enforcement. *Id.* On further appeal, the Court of Appeals reversed:

> Of course, if the parties intended to be bound by an oral agreement, a mere failure to reduce their promises to writing would be immaterial. . . . But there is no evidence of an intention of the parties to be bound by any mere oral understanding.

Indeed, they drafted a formal contract . . . and each of them retained a copy thereof until they met against the next day, when the defendant withdrew from the transaction. It is entirely plain, then, that the parties did not intend to be bound until a written agreement had been signed and delivered.

*Id.* (citations omitted).

The treatises relied upon by claimants are equally unavailing. They do not deal with or apply to NY–UCC § 8–319, nor do the propositions stated therein apply when the parties intended from the outset that delivery of written confirmation is required to crate a valid and enforceable contract. *See* 61 N.Y.Jur.2d *Statute of Frauds* §§ 2 and 150; RESTATEMENT (SECOND) OF CONTRACTS §§ 110(2)(b) and 133 (1979).

The Account Agreements required delivery of written confirmation to create a binding contract between Adler and its customers. Claimants do not deny that the course of dealing between Adler and all of them was to send written confirmation of any trade that Adler cleared. As in *Schwartz,* the evidence shows that debtor and Claimants did not intend to be bound until debtor delivered written confirmation of a trade to them. That written confirmation was, in fact, the only communication that ever took place between debtor and Claimants. Without one, Claimants cannot satisfy N.Y.U.C.C. § 8–319(a).

Claimant Norman Bennett asserts that "delivery" of a written confirmation cannot be required under § 8–319(a) as a matter of statutory construction because "delivery" is expressly mentioned in subsection (c) of the statute, while it does not appear in subsection (a). He misconstrues the interaction of those two subsections and the purpose served by § 8–319(c). Subsection (a) states the general statute of frauds applicable to all contracts involving the sale of securities, of which contracts involving confirmations traditionally sent by brokers is only a subset. Subsection (c) deals specifically with contracts evidenced by a confirmation. As not-

---

7. Claimants quote from the Appellate Division's opinion in *Schwartz* without noting that it was subsequently reversed on appeal.

ed in the official comment to N.Y.U.C.C. § 8–319:

> Paragraph (c) is particularly important in the relationship of broker ... and customer. Normally, a great volume of such business is done over the phone. Orders are executed almost immediately and confirmed on the same or next business day, usually on standard forms which as to the broker more than meet the minimal requirements of paragraph (a). . . .

Official Uniform Comment to N.Y.U.C.C. § 8–319 (Bender 1997). Thus, the express reference to "delivery" of a confirmation in subsection (c) does not mean that a writing need not be delivered in order to be effective as a binding contract under subsection (a). Rather, that requirement recognizes that in securities transactions involving customers and brokers, a confirmation is generally the only written communication between them indicating whether or not the customer's trade has been executed. Moreover, if an undelivered confirmation satisfies the statute of frauds, 8–319(c) is irrelevant—the delivery requirements of that subsection would be unnecessary because the contract would exist as soon as the confirmation was created.

Claimants maintain that the trustee's construction of the Series 500 Rules and New York's statute of frauds incorrectly reads the "executory contract" prong of §§ 300.501 and 300.502 out of the Rules. According to them, delivery of a confirmation cannot be required in all cases because the Rules expressly contemplate a situation when no such confirmation exists—*i.e.*, where there is an executed or executory contract for the purchase or sale of securities. They contend that if we construe New York law to require delivery of a written confirmation as a prerequisite to the enforceability of a securities contract, whether "completed" or "executory", we will have rendered that prong of the Rules superfluous. We disagree.

■ Neither the Series 500 Rules nor the Bankruptcy Code defines the terms "executory contract", "completed contract" or even "contract". Thus, we look to state law to determine whether a contract for the sale of securities is enforceable. Here, due to the nature of the transaction in question—namely, one involving a customer and a securities broker—N.Y.U.C.C. § 8–319 requires that the customer have received written confirmation of a trade before it can be enforced. If some other kind of transaction were involved, such as, for example, where delivery of a certificated security or transfer instruction has been accepted or the transfer of an uncertificated security has been registered without objection, the "executory contract" prong of the Series 500 Rules would be fully applicable. Claimant's rely on *Murray v. McGraw (In re Bell & Beckwith)*, 821 F.2d 333 (6th Cir.1987), in an effort to support their contention that even if a trade does not satisfy New York's statute of frauds, it must still be recognized under SIPA. Their reliance is misplaced. In that case, the Sixth Circuit, prior to the enactment of the Series 500 Rules, addressed the rights of customers whose trade and settlement dates straddled the filing date. The court noted that reference to the UCC is helpful, but not dispositive, in determining the rights of the customers, but that SIPA, to the extent that it altered those rights in any way, ultimately determines whether customers have a claim for cash or a claim for securities. *Id.* at 338. Significantly, however, the *Bell & Beckwith* court was operating in a vacuum—there were no rules governing the straddle situation at issue. Here, by contrast, the Series 500 Rules were implemented to deal with precisely this kind of situation. As in *Bell & Beckwith*, we look to state law, and in particular, the UCC, to interpret and apply the Rules. As noted previously, we do not read the N.Y.U.C.C. § 8–319 to be inconsistent with Rules 500.301 and 500.302. The Series 500 Rules provide that for a customer to have a claim for cash or for securities, it must have either a confirmation or a contract. For the kind of transactions at issue here, § 8–319 states that the customer must have something in writing to satisfy the statute of frauds, whether in the form of a written contract or a written confirmation.

We reject Claimants' assertion that debtor's computer records and other books and records represent the signed writing required by § 3–819 and the Series 500 Rules. The course of dealing between debtor and its

customers required transmission of written confirmation of a trade to make it binding. No such confirmations were ever sent. We also reject Claimants' assertion that because debtor never canceled the trades in accordance with its customary practice, binding contracts exist for purposes of the Series 500 Rules. Quite simply, there was no contract to "cancel" because Adler never confirmed the 2/24 Trades to create one.

Finally, Claimant Norman Bennett contends that he has proof that certain trades which are the subject of this cross-motion actually occurred, and that he has therefore satisfied N.Y.U.C.C. § 8–319, because the trustee is holding 7,000 shares of IBM for his account. According to Bennett, the trustee's records reflect that Adler has received two dividend payments for 7,000 shares of IBM. However, the record reflects that Bennett's assertions are based upon post-Filing Date bookkeeping entries indicating what each customer would have received in respect of the Blue Chip securities if the trades had actually been consummated. *See* Donohue Decl. 1–2. Those entries were made by the trustee only to track the estate's ultimate exposure to Claimants in the event that the trustee is not successful in this litigation, and is directed to give them not only the Blue Chip securities, but also any dividends that may have been distributed in respect of them since the Filing Date.

### Conclusion

We grant the trustee's cross-motion for summary judgment upholding his determinations with respect to Claimants' claims.

SUBMIT ORDER AND JUDGMENT.